UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS SHIMMEL,

    Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

    Defendant.

_____/

Case No. 1:21-cv-358

Hon. Hala Y. Jarbou

**REPORT AND RECOMMENDATION**

Benjamin Shimmel (sometimes referred to as "Mr. Shimmel") died on December 5, 2019. At the time of his death, Mr. Shimmel was a prisoner in the custody of the Michigan Department of Corrections ("MDOC") at the Oaks Correction Facility (sometimes referred to as "ECF"). Thomas Shimmel, personal representative of the Estate of Benjamin Shimmel, deceased ("plaintiff") filed this lawsuit against the MDOC and a number of individual defendants employed at ECF. After the Court dismissed the complaint, plaintiff filed an amended complaint which named Corrections Officer ("CO") John Farago, Psychologist Lisa Rutkowski, and John Does. Amend. Compl. (ECF No. 37).[1] This matter is now before the Court on defendant's combined motion in which CO Farago seeks dismissal and both defendants seek motion for summary judgment (ECF No. 42).

---

[1] The Court notes that plaintiff changed the defendants in the case caption to "John Farago, Lisa Rutkowski, and John Does, in their individual capacities." *See* Amend. Compl. (ECF No. 37). The parties are advised to use the caption as set forth on the docket sheet unless the Court orders otherwise.

1

### I. The amended complaint

A state court sentenced Mr. Shimmel to prison on May 29, 2019. He was incarcerated at the MDOC's Central Michigan Correctional Facility (STF). Amend. Compl. at PageID.350. *Id*. On December 2, 2019, a "Qualified Mental Health Professional (QMHP) / Qualified Health Professional (QHP)" at the MDOC evaluated Mr. Shimmel because he expressed suicidal thoughts and reported hearing voices telling him to kill himself. *Id*. at PageID.351. At that time, Mr. Shimmel stated that he wanted to "make a shank out of a paper clip" and began scratching his wrist with a paperclip and a pen. *Id*. Mr. Shimmel reported suicide plans such as running to the fence so that guards would shoot him or punching someone so that he would be beaten to death. *Id*. Plaintiff alleged that:

> 20. The QMHP/QHP also noted that Mr. Shimmel was experiencing several stressors, which included being a recent PREA victim, being moved from the sexual offender unit to an outpatient treatment unit, being "pressed" by other inmates, being placed on sanctions due to getting a tattoo, and struggling with the death of his stepmother's mother.
>
> 21. The QMHP/QHP further noted that Mr. Shimmel had a history of suicidal ideation, four psychiatric hospitalizations, and a history of substance abuse.
>
> 22. The QMHP/QHP had also received reports that Mr. Shimmel was banging his head because he was distraught over another inmate being moved out of his housing unit.
>
> 23. Mr. Shimmel's self-injurious behavior had gotten so bad that day that he had to be placed in standing soft restraints with a helmet.
>
> 24. Because Mr. Shimmel continued to engage in self-injurious behavior, an emergency chair restraint eventually had to be implemented.
>
> 25. After Mr. Shimmel's evaluation on December 2, 2019, the QMHP created a "Mental Health Management Plan" and determined that Mr. Shimmel was at moderate risk of suicide or self-injury.
>
> 26. The Mental Health Management Plan identified specific restrictions that were put in place based on Mr. Shimmel's risk level and required that Mr. Shimmel be

> placed in a suicide observation cell with observation every 15 minutes, provided only finger foods for meals with no eating utensils, and issued a protective gown.
>
> 27. The Mental Health Management Plan also indicated that staff should observe and report certain behaviors of Mr. Shimmel to a QMHP.

*Id*. at PageID.351-352.

On December 2, 2019, at 10:29 p.m., non-party Rebecca Smith submitted an Intrasystem Transfer Summary to St. Louis Correctional Facility (SLF) to inform the staff about Shimmel. *Id*. at PageID.353. The summary indicated that Mr. Shimmel "would move about the shower repeatedly hitting the ceiling with open hands as well as with knuckles" and "had current symptoms of psychosis, depression, anxiety, and aggression." *Id*.

On December 3, 2019, at 10:58 a.m., non-party Robert Cooper, MALLP, LPC, "determined that Mr. Shimmel remained at moderate risk of suicide or self-injury and kept the same restrictions in place from December 2nd." *Id*. On that date, Mr. Shimmel was transferred from STF (a level one prison) to SLF (a level four prison). *Id*. When he arrived at SLF, Mr. Shimmel "was combative with the staff by trying to hit, kick, and bite staff members" and was referred for an evaluation of suicide risk based on this conduct. *Id*. at PageID.353-354.

On December 4, 2019, at 9:23 a.m., non-party LPC Amie Ramirez conducted the evaluation. *Id*. at PageID.354. At that time, Mr. Shimmel expressed that he was concerned about being housed in a level four facility. *Id*. LPC Ramirez placed him on an intermediate suicide risk plan. *Id*. At 4:04 p.m., non-party RN Mary E. Zamora submitted an Intrasystem Transfer Summary that notified ECF of Mr. Shimmel's current active medications and his mental health assessment. *Id*.

On December 5, 2019, at 12:52 p.m., LPC Ramirez completed a Behavioral Health Observation of Mr. Shimmel. *Id*. At that time, Mr. Shimmel "was aware that he was being

transferred to another level four facility" and "again expressed to Amie Ramirez that he was very anxious about the possibility of being moved to a level 4 facility." *Id*. LPC Ramirez made the following observations: Mr. Shimmel's appearance was disheveled; his speech was soft; he was depressed; he had poor reasoning; he had poor impulse control; and his stress level was so high that he was stuttering. *Id*. at PageID.355. Based on these observations, LPC Ramirez placed Mr. Shimmel on the "intermediate risk plan" and noticed ECF staff of Shimmel's status. *Id*.

Later that day, Mr. Shimmel was transferred to ECF (another level four facility). *Id*. At 1:50 p.m., defendant Lisa Rutkowski, LLP, MA, updated his chart, noting that Mr. Shimmel was scheduled for transfer to ECF that afternoon and that he would be scheduled for an "admit to opt and for a med review." *Id*. However, despite having knowledge about Mr. Shimmel's behavior and documented suicide risk over the prior three days, Ms. Rutkowski decided not to meet with Shimmel when he arrived at ECF on December 5, 2019. *Id*. Instead, Ms. Rutkowski delayed her meeting with Mr. Shimmel until the next day. *Id*. Plaintiff contends that Ms. Rutkowski was deliberately indifferent to Mr. Shimmel's constitutional rights because "no intervention occurred at ECF by a licensed medical professional to evaluate and to prevent Mr. Shimmel from committing suicide on December 5, 2019." *Id*. at PageID.356. Despite notice of Mr. Shimmel's documented suicide risk from LPC Ramirez, Shimmel was placed in a cell by himself at ECF "with bedsheets and a circular metal device about 80 inches up the wall—both of which Mr. Shimmel used to commit suicide." *Id*.

Shimmel was assigned to the cell subject to 15-minute welfare checks by corrections officers. *Id*. at PageID.357.[2] At that time, defendant CO Farago was responsible for

---

[2] As discussed, *infra*, defendants have executed affidavits that Mr. Shimmel was subject to being checked every 30 minutes, not every 15 minutes.

conducting scheduled rounds in Shimmel's housing unit. *Id*. The last round that Farago made while Shimmel was alive occurred at approximately 9:26 p.m. *Id*. Farago conducted his next rounds at approximately 9:46 p.m. *Id*. When he arrived at Shimmel's unit, Farago found him hanging from a bed sheet secured to a circular metal device on the wall. *Id*. Plaintiff alleged that Farago failed to conduct himself in accordance with the policies for observing Shimmel in a unit that required observation every 15 minutes. *Id*. Plaintiff contends that Farago was deliberately indifferent to Shimmel's constitutional rights, and as a direct and proximate result of his actions, Shimmel committed suicide in his cell. *Id*.

Plaintiff's amended complaint consists of one count. In this Count I, brought pursuant to 42 U.S.C. § 1983, plaintiff alleged that defendants CO Farago and Ms. Rutkowski were deliberately indifferent to Mr. Shimmel's serious medical needs in violation of the Eighth Amendment. *Id*. at PageID.362-366. Plaintiff seeks compensatory damages, punitive damages, attorney's fees, costs and interest under § 1983 and the Michigan Wrongful Death Act. *Id*. at PageID.365-366. While plaintiff also seeks damages under the Rehabilitation Act, 29 U.S.C. § 794(a), he did not include allegations for relief under that Act. *Id*. at PageID.365-366.[3]

### II.     Defendant CO Farago's motion to dismiss

#### A.     Legal standard

Defendant CO Farago has filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim if it fails to give the defendants a fair notice of the claim and the grounds upon which it rests. *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007).

---

[3] The Court notes that plaintiff's Rehabilitation Act claim brought against former defendant MDOC (Count III of the original complaint) was dismissed with prejudice. *See* Report and Recommendation (ECF No. 36, PageID.344); Order (ECF No. 36, PageID.346).

> [A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted). In this regard, "an unadorned, the - defendant - unlawfully - harmed - me accusation" is insufficient to state a claim for relief. *See Iqbal*, 556 U.S. at 678.

In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). In this regard, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

### B.  Plaintiff's Eighth Amendment claim

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983

Here, plaintiff alleged that CO Farago was deliberately indifferent to Mr. Shimmel's serious medical needs. It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the 8th Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable 8th Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id*. at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an 8th Amendment violation. *Id*. at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state

of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734, F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).

### C.  Deliberate indifference involving suicide

"Suicide is a difficult event to predict and prevent and often occurs without warning." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). In the prisoner-suicide context, "proof of a prisoner's psychological needs manifesting themselves in suicidal tendencies with 'a strong likelihood that he would attempt to take his own life' are sufficiently serious for purposes of the objective component." *Galloway v. Anuszkiewicz*, 518 Fed. Appx. 330, 333 (6th Cir. 2013) (citing *Gray*, 399 F.3d at 616). "The subjective component is satisfied with proof that a prison official drew an inference from the available facts that there was a 'strong likelihood' of prisoner suicide, but then disregarded that risk by failing to take adequate precautions to mitigate the risk." *Id*. citing *Gray*, 399 F.3d at 616.

> Thus, to be held liable, "[a] prison official must be cognizant of the significant likelihood that [the prisoner] may imminently seek to take his own life and must fail to take reasonable steps to prevent the [prisoner] from performing this act." *Linden v. Washtenaw Cnty.*, 167 Fed.Appx. 410, 416 (6th Cir.2006) (quoting *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir.2000)).

*Id*.

### D.  Failure to state a claim

Here, plaintiff alleged that: CO Farago was responsible for conducting checks on Mr. Shimmel every fifteen minutes; that CO Farago knew of Mr. Shimmel's suicide risk per the information that LPC Ramirez sent to ECF; that CO Farago conducted a check on Mr. Shimmel at approximately 9:26 p.m.; that CO Farago did not conduct another round until approximately 9:46 p.m. "at least twenty minutes after the previous check was completed"; and, that CO Farago was

deliberately indifferent to Mr. Shimmel for leaving him unsupervised for more than 15 minutes which resulted in Mr. Shimmel's suicide. Amend. Compl. at PageID.360-361.

Based on these allegations, plaintiff has alleged a plausible Eighth Amendment claim against CO Farago. Whether that claim has merit is a question of fact, *e.g.*, was CO Farago responsible for checking on Mr. Shimmel every 15 minutes; did CO Farago know that Mr. Shimmel was a suicide risk per the plan assigned by LPC Ramirez; and did CO Farago fail to make a timely check on Mr. Shimmel. Accordingly, defendant CO Farago's motion to dismiss should be denied.

### III.   Defendants' motion for summary judgment

#### A.   Legal standard

In a separate motion, both defendants seek summary judgment on plaintiff's Eighth Amendment claims pursuant to Fed. R. Civ. P. 56(a). The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

9

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

Here, both defendants seek summary judgment based on the affirmative defense of qualified immunity. Under this defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

The existence of qualified-immunity inquiry involves two questions: whether the defendant violated a constitutional right and whether that right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016). "On summary judgment, the

court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Id*. When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

### B. Discussion

Among other evidence supporting their motion, defendants submitted a declaration from CO Farago, an affidavit from Ms. Rutkowski, and declarations from three other MDOC employees who saw Mr. Shimmel that afternoon. In his declaration, CO Farago stated that:

> He did not have any interaction with prisoner Benjamin Shimmel (MDOC ID# 576592) before Shimmel committed suicide in his cell on December 5, 2019 other than observing Shimmel while doing rounds in the housing unit. He had no conversations with Shimmel, and there was nothing about Shimmel's appearance or behavior that led me to believe he was a suicide risk. Moreover, he had no access to, or knowledge of, Shimmel's medical and mental health records and history. Thus, he was not cognizant of a significant likelihood that Shimmel was likely to imminently seek to take his own life.

Farago Decl. (ECF No. 43-7, PageID.506).

In her affidavit, Ms. Rutkowski stated that she is a psychologist at ECF. Rutkowski Aff. (ECF No. 43-8, PageID.508). Ms. Rutkowski explained:

> 4. On December 5, 2019, she was advised that prisoner Benjamin Shimmel #576592 would be transferring to ECF and that he would be assigned to my case load. Prior to his arrival at ECF she reviewed his electronic medical record (EMR) and noted that he was on out-patient mental health team (OPT); and further, on 12/4/19 he was placed on an intermediate suicide risk management plan and going to segregation. She then made the following entry into his EMR:
>
>> "Chart entry only: Prisoner is scheduled to transfer from SLF to ECF this afternoon. He is on opt and assigned to this caseworker's caseload. His chart was reviewed. He is on an Intermediate Suicide Risk Mgt. Plan and scheduled to be placed in the segregation unit.

11

> He was last seen by a QMHP on 12/5/19 per his IMP. He will be scheduled for an admit to OPT and for a med review."
>
> 5. An intermediate suicide risk management plan dictates that the prisoner is on normal custody handling with no restrictions and regular rounds. Therefore, officer rounds would be in 30-minute intervals. There are no restrictions, and the prisoner is also allowed all property that is approved for his housing level. This would include sheets, clothing etc.
>
> 6. On an intermediate suicide risk management plan, the QMHP/QHP will re-evaluate the prisoner every other business day for one week and then once weekly for two weeks. Amie Ramirez, LPC evaluated Mr. Shimmel on 12/04/2019, and placed him on an MDOC Mental Health Management Plan as being an Intermediate Risk of suicide or self-injury. Therefore, Mr. Shimmel would be scheduled for suicide evaluation on 12/6/19. The admit to OPT is to be completed within 5 business days from arrival. His "OPT-New to Segregation Contact" is due within one business day (12/6/19). A medication review would normally occur within a week or two from the expiration date of his medications.
>
> 7. She did not infer from reading Shimmel's chart that it was highly likely that he would imminently commit suicide. In fact, his chart reflected that Shimmel was denying suicide ideation as of 12/4/19.

*Id*. at PageID.509-510.

> In his declaration, ECF RN Drake stated that:
>
> 4. He encountered Shimmel in the prison health care clinic when Shimmel arrived at Oaks Correctional Facility at approximately 15:25 hours on December 5, 2019. Shimmel denied having any health complaints or thoughts of self-harm. Moreover, there was nothing about his appearance, speech, or behavior that caused me any concern that he was at risk for self-harm.
>
> 5. He also encountered Shimmel after Shimmel had been found hanging in his cell, and he assisted in resuscitation efforts.

RN Drake Decl. (ECF No. 43-9, PageID.513).

> In his declaration, ECF employee Gideon Mitchell stated that:
>
> 4. He had a brief encounter with Shimmel before Shimmel committed suicide. At approximately the 18:30 time frame on December 5, 2021, he received a class II misconduct from Housing Unit 5 and reviewed it with Mr. Shimmel. The interaction consisted of Mitchell waking Mr. Shimmel. Mitchell woke him up as he approached Shimmel's cell door. Shimmel approached the door. Mitchell

> conducted the review with Shimmel through the door. Mitchell asked Shimmel if he wanted to accept days or go to court. Shimmel replied, stating, "Fuck you and your days." Mitchell proceeded to ask Shimmel if he wanted to sign the review. Shimmel replied, again stating "Fuck you." Mitchell handed Shimmel the misconduct and closed his door slot and walked away. Mitchell had no further interactions with Shimmel until the call for assistance (when Shimmel was discovered hanging in his cell) came over the radio.
>
> 5. On December 5, 2019 he did not know that Shimmel's psychological needs were manifesting themselves into suicidal tendencies, and, thus, he was not perceive that Shimmel was likely to imminently attempt to commit suicide.

Mitchell Decl. (ECF No. 43-10, PageID.516).

In her declaration, ECF RN Adie Briske stated that:

> 4. The only interaction she had with Shimmel before he committed suicide was during evening med pass in his housing unit on December 5, 2019. The interaction was unremarkable. Shimmel did not indicate that he had any health concerns or that he was contemplating self-harm. I saw nothing about his appearance or speech that raised any concerns that he was a suicide risk.
>
> 5. She was not aware that Shimmel's psychological needs were manifesting themselves into suicidal tendencies, and, thus, she was not cognizant of a significant likelihood that Shimmel was likely to imminently seek to take his own life.

Briske Decl. (ECF No. 43-11, PageID.518).

Plaintiff has two basic claims against CO Farago. First, CO Farago failed to perform 15-minute rounds as required. Second, CO Farago failed to comply with the suicide risk plan from LPC Ramirez. CO Farago's affidavit did not address the timing of his rounds. In her affidavit, Ms. Rutkowski pointed out that under the intermediate suicide risk management plan, the prisoner is on normal custody handling with no restrictions as to property (*i.e.*, bed sheets are allowed) with "regular rounds" (meaning that officer rounds would be in 30-minute intervals). These facts would eliminate plaintiff's first claim that CO Farago failed to make the required 15-minute rounds. However, CO Farago's declaration does not present facts address plaintiff's second claim. While CO Farago stated that he did not speak with Mr. Shimmel, he does not recite the facts which

13

describe Mr. Shimmel's "appearance or behavior" which "led [Farago] to believe [Mr. Shimmel] was a suicide risk." Nor does CO Farago describe exactly what he was supposed to observe while conducting rounds. While neither of the medical professionals who observed Mr. Shimmel that day opined that he appeared to be at risk for self harm, Shimmel was agitated at one point, having received a misconduct at about 4:54 p.m. for disobeying a direct order to return his food tray (*see* Misconduct Report (ECF No. 46-3, PageID.672)) and responding to Mr. Mitchell with obscenities. Accordingly, the Court concludes that genuine issues of material fact exist with respect to plaintiff's claim against CO Farago which preclude summary judgment at this time.

With respect to Ms. Rutkowski, plaintiff alleged that she was deliberately indifferent to Mr. Shimmel's serious medical needs because: no one evaluated Mr. Shimmel when he arrived at ECF; he was placed in a unit that was unfit for an individual with suicidal ideations; and as a result he committed suicide that same day. Amend. Compl. at PageID.359. In her affidavit, Ms. Rutkowski noted that Mr. Shimmel was placed on an intermediate suicide risk plan at SLF, that the same plan applied at ECF, and that under the plan his next appointment would be December 6, 2019. While Ms. Rutkowski provided an outline of an intermediate suicide risk plan, she provided few details on the specific requirements of the plan or explain how "normal custody handling with no restrictions" applied in Mr. Shimmel's situation. In addition, while Ms. Rutkowski stated that she inferred from Mr. Shimmel's chart that it was highly unlikely that he would commit suicide, she did not explain the facts which supported that inference. Accordingly, the Court concludes that genuine issues of material fact exist with respect to plaintiff's claim against Ms. Rutkowski which preclude summary judgment at this time.

Furthermore, plaintiff contends that a motion for summary judgment is premature. The Court dismissed plaintiff's original complaint sued the MDOC and 15 individual defendants.

After plaintiff filed the amended complaint and served Ms. Rutkowski, defendants responded by filing the motion to dismiss CO Farago pursuant to Fed. R. Civ. P. 12(b)(6) and the motion for summary judgment as to both defendants pursuant to Fed. R. Civ. P. 56(a).  The parties may have engaged in some informal discovery before that time: defendants' motion included over 100 pages of documents (ECF Nos. 43-2 through 43-11) and plaintiff's response included over 500 pages of documents (ECF Nos. 46-2 through 46-8).  Given these motions, defendants limited involvement with Mr. Shimmel, the extensive documentation submitted by the parties, and defendants' claims of qualified immunity, the Court deferred scheduling a Rule 16 conference pending a resolution of the dispositive motions.

In his response, plaintiff stated that summary judgment is premature.  While a party may move for summary judgment "at any time until 30 days after the close of discovery", *see* Fed. R. Civ. P. 56(b), "summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery," *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002).  In this regard, Fed. R. Civ. P. 56(d) provides a mechanism for a party to obtain discovery necessary to respond to a motion for summary judgment:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

"The purpose behind Rule 56(d) is to ensure that plaintiffs receive a full opportunity to conduct discovery to be able to successfully defeat a motion for summary judgment." *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (internal quotation marks omitted).  Here, plaintiff's counsel filed an affidavit stating that summary judgment should not be granted pursuant to Fed. R. Civ. P. 56 because: discovery is ongoing; counsel is making a good faith effort to obtain

discovery; counsel requests more time for discovery to identify and depose the inmates that were adjacent to Mr. Shimmel's cell; and, that counsel intends on deposing the defendants as well as the QMHPs that treated Mr. Shimmel in the days preceding his death. Nancy Knight Aff. (ECF No. 46-8).

The Court considers five factors in addressing a motion for further discovery brought pursuant to Fed. R. Civ. P. 56(d): (1) when the party learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would alter the Court's ruling on the motion for summary judgment; (3) how long the parties have already had to conduct discovery; (4) whether the party seeking relief has been dilatory in its discovery efforts; and (5) whether the opposing party was responsive to discovery requests. *See Doe*, 928 F.3d at 491.

Plaintiff is entitled to additional discovery. While the parties appear to have had access to hundreds of pages of documents related to this matter and plaintiff's counsel stated that some type of discovery is "ongoing," the parties have not yet engaged in formal discovery. Given the allegations and defendants limited involvement with Mr. Shimmel, it was conceivable that defendants could have presented a record to support a summary judgment on the grounds of qualified immunity. However, defendants did not provide sufficient facts to establish that affirmative defense. Plaintiff has identified basic discovery which they require to adequately respond to a motion for summary judgment, such as deposing the defendants and fact witnesses who observed Mr. Shimmel during the relevant time period.

While plaintiff does not allege that CO Farago had any direct contact with Mr. Shimmel and he only checked on Shimmel twice, Farago's declaration does not document his observations of Mr. Shimmel, who appeared to have been in an agitated state earlier that day.

Plaintiff is entitled to engage in discovery, such as deposing defendant CO Farago and the inmates who witnessed Mr. Shimmel's condition when CO Farago did his rounds that evening.

Like CO Farago, Ms. Rutkowski had no direct contact with Mr. Shimmel. Ms. Rutkowski's involvement consisted of reviewing Mr. Shimmel's chart, classifying his risk, and scheduling him for an evaluation at ECF. While Ms. Rutkowski's affidavit contains some basic facts, it does not provide a comprehensive discussion of Mr. Shimmel's situation, the relevant MDOC policies, the relevant medical record, and her decision-making process. Plaintiff is entitled to take depositions of Ms. Rutkowski as well as the QMHPs who treated Mr. Shimmel in the days leading up to his transfer to ECF.

For all of these reasons, defendants' motion for summary judgment should be denied without prejudice.

### IV.     Recommendation

Accordingly, I respectfully recommend that defendants' combined motion (ECF No. 42) should be **DENIED** as to CO Farago's motion to dismiss and **DENIED** without prejudice as to defendants' motion for summary judgment.

Dated:  February 6, 2023                                /s/ Ray Kent
                                                        RAY KENT
                                                        United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).