UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS SHIMMEL,

    Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al.,

    Defendants.
_____/

Case No. 1:21-cv-358

Hon. Hala Y. Jarbou

## **OPINION**

Plaintiff Thomas Shimmel brings this civil rights action under 42 U.S.C. § 1983 on behalf of the estate of Benjamin Shimmel ("Shimmel"), who committed suicide while incarcerated with the Michigan Department of Corrections ("MDOC") at the Oaks Correctional Facility (ECF). The remaining named defendants, Corrections Officer John Farago and Psychologist Lisa Rutowski,[1] filed a motion to dismiss the complaint and/or grant summary judgment in their favor (ECF No. 42).

On February 6, 2023, the magistrate judge issued a Report and Recommendation ("R&R"), recommending that the Court deny Defendants' motion. (R&R, ECF No. 49.) Defendants have filed objections. For the reasons herein, the Court will reject the R&R and grant Defendants' motion.

---

[1] In their briefing, Defendants tend to spell Rutowski's name as "Rutkowski," but the Court will use the spelling in Plaintiff's complaint and Rutowski's affidavit.

# I. STANDARDS

### A. Review of Objections

Under Rule 72 of the Federal Rules of Civil Procedure,

> the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

### B. Dismissal for Failure to State a Claim

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff to make a "short and plain statement of the claim showing that the pleader is entitled to relief." The statement must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "[t]he plausibility standard . . . is not akin to a probability requirement . . . it asks for more than a sheer possibility" that the alleged misconduct occurred. *Id*. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). "[A] statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008).

When considering a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, or "formulaic recitations of the elements of a cause of action," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Courts are generally bound to consider only the complaint when resolving a motion to dismiss, but the Court may also consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### C. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### D. Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "While the defendant 'bears the burden of pleading' a qualified immunity defense, '[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.'" *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)).

When evaluating a qualified immunity defense, the Court must take care "not to define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The relevant question is whether "it would have been clear to a reasonable offic[ial] that the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

## II. BACKGROUND

According to the complaint, Shimmel began his incarceration in May 2019. On December 2, 2019, while he was housed at the Central Michigan Correctional Facility (STF), a qualified mental health professional ("QMHP") at the prison evaluated Shimmel and concluded that he was at "moderate risk of suicide or self-injury." (Am. Compl. ¶ 25, ECF No. 37.) Among other things, Shimmel expressed suicidal thoughts and reported hearing voices that told him to kill himself. (*Id.* ¶ 18.) He also said that he wanted to make a "shank" out of a paperclip and he began scratching his wrist with a paperclip and pen. (*Id.* ¶ 19.) The QMHP noted several "stressors" in Shimmel's life, including being a recent "PREA victim," being moved from one unit to another, being placed on sanctions, and struggling with the death of his stepmother's mother. (*Id.* ¶ 20.) The QMHP also noted that he had a history of suicidal ideation, four psychiatric hospitalizations, and a history of substance abuse. He was also "distraught" because another inmate had been moved out of his unit. (*Id.* ¶ 22.) That same day, prison staff had to prevent him from injuring himself by putting him in "standing soft restraints," and then an "emergency chair restraint." (*Id.* ¶¶ 23-24.)

The QMHP put Shimmel on a "moderate suicide risk plan" that required placement in a suicide observation cell where he would be "observ[ed] every 15 minutes, provided only finger foods for meals with no eating utensils, and issued a protective gown." (*Id.* ¶¶ 26, 35.) The plan

4

also required staff to report concerning behaviors to a QMHP and indicated that a health professional would "reevaluate" Shimmel "every business day." (*Id.* ¶ 29.)

On the evening of December 2, 2019, a prison official noted in an "Intrasystem Transfer Summary" that Shimmel had symptoms of "psychosis, depression, anxiety, and aggression." (*Id.* ¶ 31.) She sent this summary to St. Louis Correctional Facility (SLF). The following day, prison staff transferred Shimmel to SLF.

When Shimmel arrived at SLF on December 3, 2019, he was "combative with staff," so he was referred for an "Evaluation of Suicide Risk." (*Id.* ¶ 37.) Licensed Professional Counselor ("LPC") Amie Ramirez evaluated Shimmel on December 4, 2019, and placed him on an "*intermediate* suicide risk plan." (*Id.* ¶ 40 (emphasis added).) After that evaluation, Registered Nurse Mary Zamora completed an "Intrasystem Transfer Summary" to notify ECF of Shimmel's medications and mental health assessment, in preparation for a transfer to ECF. (*Id.* ¶ 41.)

Ramirez allegedly completed a "Behavioral Health Observation" of Shimmel on December 5, 2019, noting that he was "disheveled; his speech was soft; he was depressed; he had poor reasoning; and he had poor impulse control." (*Id.* ¶¶ 42, 44.) Also, his stress level "was so high that he was stuttering." (*Id.* ¶ 45.) Shimmel told Ramirez that he was "very anxious" about being transferred to ECF. (*Id.* ¶ 43.) She kept him on the "intermediate risk plan." (*Id.* ¶ 46.) She also "notified staff at ECF of Mr. Shimmel's status." (*Id.* ¶ 47.)

That afternoon, Defendant Rutowski updated Shimmel's chart, noting that he was scheduled for transfer to ECF and would be scheduled for "'adm to opt and for a med review.'" (*Id.* ¶ 49.) Shimmel then transferred to ECF. Rutowski did not meet with him to evaluate him when he arrived at ECF on December 5. According to Plaintiff, she was aware of Shimmel's suicide risk during the three previous days, his mental illnesses, his reports of a desire to commit

self-harm, his nervousness about being moved to ECF, and his stress from being moved between facilities. (*Id.* ¶ 78.) Nevertheless, she "delayed" her evaluation until the following day. (*Id.* ¶ 51.)

Prison staff at ECF allegedly placed Shimmel in a "unit that was unfit for an individual with suicidal ideations[.]" (*Id.* ¶ 55.) They assigned him to a cell with bedsheets and a "circular metal device about 80 inches up the wall," which he used to commit suicide later that day. (*Id.* ¶ 57.)

In Shimmel's unit, prison policies required "15-minute welfare checks by corrections officers." (*Id.* ¶¶ 58, 66.) Defendant Farago was the officer responsible for conducting the welfare checks in that unit. (*Id.* ¶ 60.) The last time Farago conducted a round of welfare checks while Shimmel was still alive was at 9:26 pm. (*Id.* ¶ 61.) Farago conducted his next round of checks at 9:46 pm, approximately twenty minutes after his previous round. (*Id.* ¶ 62.) At that time, Farago found Shimmel hanging from a bed sheet secured to the metal device on the wall.

Based on the foregoing, Plaintiff claims that Defendants Rutowski and Farago were deliberately indifferent to Shimmel's health and safety, in violation of the Eighth Amendment.

## III. ANALYSIS

### A. Officer Farago

Defendant Farago objects to the magistrate judge's conclusion that the complaint states a plausible claim against him. Plaintiff claims that Farago was deliberately indifferent because he did not comply with applicable prison policies to check on Shimmel once every fifteen minutes. (*See* Am. Compl. ¶ 64.) Instead, he checked Shimmel's cell twenty minutes after his previous round of cell checks. The magistrate judge concluded that these facts stated a plausible claim. (R&R 8-9.) The Court disagrees.

As noted in the R&R, an Eighth Amendment claim requires deliberate indifference to a prisoner's health or safety:

> A viable [Eighth] Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).
>
> The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.
>
> The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an [Eighth] Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).
>
> . . . "Suicide is a difficult event to predict and prevent and often occurs without warning." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). In the prisoner-suicide context, "proof of a prisoner's psychological needs manifesting themselves in suicidal tendencies with 'a strong likelihood that he would attempt to take his own life' are sufficiently serious for purposes of the objective component." *Galloway v. Anuszkiewicz*, 518 Fed. Appx. 330, 333 (6th Cir. 2013) (citing *Gray*, 399 F.3d at 616). "The subjective component is satisfied with proof that a prison official drew an inference from the available facts that there was a 'strong likelihood' of prisoner suicide, but then disregarded that risk by failing to take adequate precautions to mitigate the risk." *Id.* citing *Gray*, 399 F.3d at 616.
>
> > Thus, to be held liable, "[a] prison official must be cognizant of the significant likelihood that [the prisoner] may imminently seek to take his own life and must fail to take reasonable steps to prevent the [prisoner] from performing this act." *Linden v. Washtenaw Cnty.*, 167 Fed. Appx. 410, 416

7

>> (6th Cir. 2006) (quoting *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)).

> *Id.*

(R&R 7-8.)

Here, Plaintiff has alleged facts amounting to negligence by Farago rather than deliberate indifference. Farago was not deliberately indifferent; he checked Shimmel's cell at least two times in close succession. A mere five-minute delay in conducting a fifteen-minute suicide check is no more than negligence. There are no facts in the complaint from which to infer that such a short delay constituted a deliberate disregard to a strong likelihood that Shimmel would commit suicide.

The Court's conclusion does not change simply because Plaintiff alleges that the unit where Farago worked had a policy requiring fifteen-minute cell checks. A policy violation does not equate to a violation of an individual's constitutional rights. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018) ("[T]he failure to follow internal policies [does not], without more, constitute deliberate indifference.").

Nor does it matter that a mental health professional had evaluated Shimmel a few days earlier and prescribed fifteen-minute cell checks due to Shimmel's "moderate" risk of suicide. Two days after that evaluation, LPC Ramirez put Shimmel on a different management plan, based on her assessment that Shimmel was at an "intermediate" level of risk. Plaintiff does not allege any details about the intermediate risk plan, but even assuming that it also required fifteen-minute cell checks, Farago's failure to strictly adhere to that plan by delaying his cell check for only five minutes is not itself sufficient to state a plausible claim of deliberate indifference to Shimmel's health and safety. Indeed, common sense suggests that no system of regular prisoner cell-checks could ever be perfectly on time. Prison officials are not machines. Also, the demands on their

time are not predictable, as they are typically responsible for more than one prisoner. Consequently, cell checks will inevitably occur at intervals that vary by a few minutes.

Furthermore, even if Plaintiff stated a possible claim, Farago would be entitled to qualified immunity because his "conduct did not violate 'clearly established . . . constitutional rights of which a reasonable person would have known' under applicable Supreme Court doctrine." *Goode v. Berlanga*, 646 F. App'x 427, 428 (6th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

*Goode* is instructive. There, a prison guard "delayed five to seven minutes" after being asked to check on an inmate who was "making gurgling noises and foaming at the mouth." *Id.* at 434. The Court of Appeals concluded that

> no precedent clearly establish[ed] that, as of April 2011, a prison guard, who had observed a prisoner sleeping only minutes earlier, had an obligation to respond without brief delay to inmates' requests that he check on the prisoner because the prisoner appeared to be seriously ill. In fact, our sister circuits have only denied qualified immunity to officers who briefly delayed in obtaining medical assistance for prisoners when the officers either personally observed the prisoner's serious medical condition prior to the delay or actually caused the prisoner's medical condition.

*Id.* at 432-33 (citing cases).

*Goode* is distinguishable in that the officer in that case had no prior knowledge of a serious illness. In contrast, Farago was already aware that Shimmel had a serious need for regular observation. Construing the facts alleged in the light most favorable to Plaintiff, Farago was aware that Shimmel was at a "moderate" or "intermediate" risk of committing suicide, necessitating regular checks to ensure his safety. Nevertheless, *Goode* is similar to the present case in that there are no facts from which to infer that Farago was aware that a brief delay of five minutes in checking on Shimmel would pose a substantial risk of serious harm. Also, as in *Goode*, Plaintiff fails to cite any authority that would have made it "'sufficiently clear that every reasonable official [in

9

Farago's position] would have understood that what he is doing violates'" Shimmel's constitutional rights. *Id.* at 430 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Accordingly, the Court will dismiss Farago as a defendant.

### B. Rutowski

The magistrate judge concluded that genuine issues of material fact remained as to Plaintiff's claim against Rutowski. Rutowski averred that she reviewed Shimmel's electronic medical records on December 5, 2019, and noted that he was on an intermediate risk suicide plan. (Rutowski Aff. ¶ 4, ECF No. 43-8.) Such a plan

> dictates that the prisoner is on normal custody handling with no restrictions and regular rounds. Therefore, officer rounds would be in 30-minute intervals. There are no restrictions, and the prisoner is allowed all property that is approved for his housing level. This would include sheets, clothing, etc.

(*Id.* ¶ 5.) Further, under a such a plan, the "QMHP/QHP will re-evaluate the prisoner *every other business day* for one week and then once weekly for two weeks." (*Id.* ¶ 6 (emphasis added).) Therefore, because Ramirez had evaluated Shimmel for suicide risk on December 4, 2019, he was scheduled for his next evaluation on December 6, 2019. (*Id.*) Rutowski also clarified that an "admit to OPT is to be completed within 5 business days from arrival" at the new prison facility, so it did not require an immediate evaluation. (*Id.*)

In addition, Rutowski noted that Shimmel's medical chart from December 4, 2019, indicated that he was "denying suicide ideation." (*Id.* ¶ 7.) Indeed, according to Shimmel's medical records, Ramirez's evaluation from that date notes that "[Shimmel] stated he is okay. No thoughts or intent to harm self at this time." (MDOC Medical Records, ECF No. 43-6, PageID.469.) Consequently, Rutowski did not believe that it was "highly likely that [Shimmel] would imminently commit suicide." (Rutowski Aff. ¶ 7.)

10

In short, Rutowski's evidence indicates that she was following the intermediate suicide risk plan implemented by Ramirez when she decided to wait until December 6, 2019, to evaluate Shimmel. Under that plan, he was scheduled for his next suicide-risk evaluation on December 6, 2019, the day after he committed suicide. Also, Shimmel's medical records supported Rutowski's assessment that Shimmel was not at imminent risk of suicide.

Plaintiff is effectively challenging the medical judgment of Rutowski and Ramirez for keeping Shimmel on the intermediate risk plan. There are two problems with that challenge. The first is that such a challenge typically does not give rise to an Eighth Amendment claim.

> An inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) (quotation marks omitted). "Where the claimant received treatment for his condition . . . he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014). "[F]ederal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Here, Ramirez evaluated Shimmel and prescribed some care for him by ordering a plan that required regular cell checks and a follow-up evaluation in two days. That decision entailed a medical judgment about the level of observation and restrictions that Shimmel required. It does not reflect care that was so woefully inadequate as to amount to no care at all.

The second problem is that Rutowski did not make the initial decision to put Shimmel on the intermediate risk plan. Plaintiff apparently argues that Rutowski should have rejected

11

Ramirez's plan, but any failure to do so was negligence at most considering that Ramirez evaluated Shimmel's mental health status in person and was better positioned to assess his needs.

The magistrate judge critiqued Rutowski for providing "few details on the specific requirements of the [intermediate suicide risk] plan" and not "explain[ing] how 'normal custody handling with no restrictions' applied in Mr. Shimmel's situation." (R&R 14.) But Rutowski's affidavit and supporting evidence indicate that she was following the plan prescribed by Ramirez, who had evaluated Shimmel in person. Rutowski could reasonably rely upon that assessment and the medical record supporting it. There is no evidence that she possessed more specific or more recent information about Shimmel that would have given her reason to believe that his condition had significantly changed such that he required a more urgent assessment. True, Shimmel moved to a new facility on December 15, and he had previously told Ramirez that he was "very anxious about the possibility of moving to a level 4 [facility]." (MDOC Medical Records, PageID.469.) However, Ramirez was aware of the upcoming transfer and Shimmel's feelings about it and nevertheless concluded that the intermediate risk plan was appropriate. (*See id.*) Rutowski followed that plan. Accordingly, no evidence suggests that her actions were deliberately indifferent.

The magistrate judge also critiqued Rutowski for failing to explain the facts in the medical record that supported her belief that it was highly unlikely that Shimmel would commit suicide; however, those facts are clearly laid out in her affidavit. As discussed, the affidavit notes the intermediate risk plan maintained by Ramirez as well as Shimmel's medical chart, which "reflected that [he] was denying suicide ideation as of 12/4/19." (Rutowski Aff. ¶¶ 6-7.) These facts supported her belief that reevaluating Shimmel's suicide risk on December 6, rather than December 5, would not pose a substantial risk of serious harm.

Plaintiff also argues that Rutowski was deliberately indifferent because she did not recognize that Shimmel "was in a 'critical period' per MDOC policy directive." (Pl.'s Br. in Resp. to Defs.' Mot. 19, ECF No. 46.) MDOC Policy Directive 04.06.115 identified several "critical periods" during which prisoners "may be at increased risk for suicidal behavior." (*See id.*) Those periods include

> initial arrival in prison, a parole denial, an additional term of incarceration, a family or relationship crisis or loss, holidays, involvement as a victim or perpetrator in a traumatic critical incident, and the diagnosis of debilitating or terminal illness.

(MDOC Policy Directive 04.06.115 § H, ECF No. 46-10.) Plaintiff argues that Shimmel met several of these criteria. However, the policy directive did not mandate particular measures for prisoners who are in such periods. In other words, it did not require daily evaluations of the suicide risk of a prisoner who is in a critical period. And at any rate, Rutowski's alleged failure to recognize the seriousness of Shimmel's condition is simply another form of negligence; it does not amount to deliberate indifference.

Finally, the magistrate judge concluded that granting summary judgment to Rutowski would be premature because discovery is "ongoing" and Plaintiff should have the opportunity to depose Rutowski and other fact witnesses "who observed Mr. Shimmel during the relevant time period." (R&R 16.) However, as noted in the R&R, "Rutowski had no direct contact with Mr. Shimmel." (*Id.* at 17.) Thus, whatever decision she made about when to evaluate Shimmel was based on the information available to her at the time, which was in Shimmel's medical record. Plaintiff possessed a copy of that record when responding to Defendants' motion. It does not support Plaintiff's claim against Rutowski. Additional facts known by those who observed Shimmel are not relevant to Plaintiff's claim against Rutowski because there is no allegation or evidence that Rutowski was aware of their observations. And it is not clear how deposing Rutowski would reveal any further relevant information. Accordingly, the Court concludes that

further discovery is not necessary to resolve Plaintiff's claim against Rutowski.  In other words, Plaintiff has failed to show that he "cannot present facts essential to justify [his] opposition" to Defendant Rutowski's motion for summary judgment.  Fed. R. Civ. P. 56(d).

## IV. CONCLUSION

For the reasons herein, the Court will reject the R&R and grant Defendants' motion.  After dismissal of Defendants Farago and Rutowski, the only remaining claims are those against the unidentified defendants.

An order will enter consistent with this Opinion.

Dated: March 20, 2023                                   /s/ Hala Y. Jarbou
                                                        HALA Y. JARBOU
                                                        CHIEF UNITED STATES DISTRICT JUDGE